JOHN B. BURR & another *vs.* GEORGE CROMPTON.
SAME *vs.* SAMUEL MAWHINNEY.
SAME *vs.* AURIN WOOD & others.
SAME *vs.* JOSEPH B. SARGENT & another.

Worcester. Oct. 7, 1874. — Jan. 11, 1875. COLT & MORTON, JJ., absent.

A contract, made by a book publisher with A., recited that the publisher was about to publish a book to be sold by subscription, through agents, in the United States and in Canada, and agreed to publish an advertisement of A. in the book, he paying a certain sum "for each and every copy sold and delivered to agents and others." A similar contract was made by the publisher with B., except that B. agreed to pay a certain sum "for every copy sold" by the publisher. Both contracts contained the clause that the publisher was to furnish, if requested, his certificate under oath as to the number of copies sold and delivered. Payments were to be made every three months from the date of publication, and A. and B. were not to be liable for copies sold after two years. In actions on these contracts by the publisher, he put in evidence that he had between 1500 and 2000 agents selling the work in the United States and in Canada, and that over 60,000 copies had been delivered by him to agents. There were also put in evidence the written requests of the agents for copies of the book, reports from agents of books subscribed for, charges made by the shipping clerk of books consigned to the agents, and carriers' receipts of books so consigned. There was also evidence that this was the usual way of selling books by subscription. There was no evidence of delivery into the hands of the individual subscribers. *Held,* that this evidence would warrant a verdict for the plaintiff for every copy sent to the agents; but not for copies sold to editors of newspapers in payment of advertising bills of the publisher.

Where a person agrees with a publisher to pay a certain sum for every copy of a book sold, payments to be made at stated intervals, and he makes payments on statements furnished him by the publisher which include copies not properly comprehended among books sold, but do not indicate the fact, he may, in an action to recover the balance due, have so much of the money paid as was not properly chargeable to him, applied in payment of said balance.

FOUR ACTIONS OF CONTRACT by John B. Burr and George M. Hyde to recover money alleged to be due from the respective defendants under agreements in writing signed by the plaintiffs and the defendants respectively.

The agreement in the first case was as follows:

"This agreement, made this 15th day of September, 1871, by and between J. B. Burr & Hyde, book publishers, of Hartford, Conn., of the first part, and George Crompton of Worcester, Mass., of the second part, witnesseth: That whereas, said Burr

& Hyde are about to publish a standard work to be entitled ' The Great Industries of the United States,' which will be sold by subscription through their authorized agents in the United States and in Canada; it is agreed by said Burr & Hyde, that said book shall contain from 720 to 1000 pages octavo, and of such a quality of paper and binding that the subscription price thereof shall not be less than two dollars and fifty cents per copy, in cloth, nor exceed the same, save as by superior style of binding; and whereas, the prospectus of said work, together with certain exemplary articles, has been duly exhibited to and examined by said Crompton, as presented by the authorized agent of said Burr & Hyde, in which work is to appear an article on Looms and Loom Building, or Fancy Looms, or some similar title to occupy a space of six pages as reading matter, in the same style of type as shown in the said articles, and in which, according to the general intent of the work, may properly be published the name and biography, in part, of said Crompton: now, therefore, in consideration of said Burr & Hyde's so incorporating in said book said article, biography, &c., to the acceptance of said Crompton, and publishing the same in the forthcoming editions of the said work, said Crompton agrees to pay to said Burr & Hyde the sum of two cents for the space occupied by the said article, for each and every copy of said work sold and delivered to agents and others. Said Burr & Hyde agree to furnish to said Crompton their certificate, properly subscribed and certified to before a justice of the peace (if so required,) as to the number of copies of said work so sold and delivered.

" It is understood and agreed that said Crompton shall pay to said Burr & Hyde the sum of indebtedness on his part which may become due under this contract, at the end of every three months after the publication and sale of the first copy of the work named, containing the article herein before mentioned. It is also agreed that said Crompton shall not be indebted to said Burr and Hyde, under the terms of this contract, for any copies of the work that shall be sold after two years from date of issue of the first copy containing said article, (it being the intent and agreement of said Burr & Hyde to give to said Crompton, in consideration of his contribution of the aforesaid article, the benefit of the same in all copies of ' The Great Industries ' aforesaid, sold

after two years from date of the first copy issued.)    Said Burr &
Hyde agree to furnish to said Crompton two bound copies of the
work containing said article."

The agreements in the other cases were similar, except that in
the last two cases the stipulation was that " the subscription price
thereof shall not be less than two dollars and fifty cents per
copy," and the defendants agreed to pay " two cents for every
copy of said work sold by said Burr & Co."

The answer in each case contained a general denial, and al-
leged that within two years from the date of issue of the said
book, the plaintiffs sold and delivered the same to persons other
than subscribers, offered the same for sale otherwise than by sub-
scription, and sold and delivered the same for a larger sum than
they were entitled to under any contract with the defendant.

The cases were sent to an auditor, who found that the plain-
tiffs had performed their part of the contracts, and had sold and
delivered a certain number of books amounting to over 60,000.
The report stated the whole number sold, and also the number
sold to editors of newspapers in payment of advertising bills, and
stated the account between the parties.    The evidence before the
auditor was stated in the report in substance as follows :

The plaintiffs, for the purpose of showing their modes of car-
rying on the business of publishing and selling books by subscrip-
tion, and particularly the book referred to in the contracts, and
to prove their performance of the contracts, and the number of
books published, sold and delivered by them, offered in evidence
voluminous books of account and papers.    These were objected
to, but admitted.

Frank W. Cooper, called by the plaintiffs, testified :  " I am
book-keeper for the plaintiffs ; have been in the business of pub-
lishing books by subscription five years ; the books were sold by
subscription.    We send circulars to parties as agents ; we furnish
canvassing books at the expense of the agent ; he reports at the
end of each week the number of subscribers he has obtained and
the different styles of binding he has orders for."    (A large file of
these weekly reports is exhibited.)    " The agents usually report
by printed blanks, but sometimes by letter.    They do not return
to us the canvassing books ; here are all we have, but they are
not all that were sent out ; the agents keep their books."    (A lot

of canvassing books is exhibited . showing the names and residence of subscribers, and style of bir.ding ordered.) " Next they order the books they want to be delivered to them, sometimes by letter, sometimes by printed blanks." (A large file of these is exhibited.) " I next draw off the order and hand it to the shipping clerk to pack, and the shipping clerk pastes my orders in a book, called an invoice book, kept in form of a scrap-book. This invoice book was filled up March 31, 1873, and thereafter my orders are on files exhibited.

" The shipping clerk packs the goods, returns to me a copy of my order, and enters on a book called the shipping book his shipments; I have shipped some of them, and they are in my handwriting, and some by the plaintiff, Burr; most of them were shipped by Blakely, the shipping clerk. Having received these duplicates from the shipping clerk, I made out the bills and charged on the book ·of original entry to the agents, on the journal. These accounts with agents and credits on the journal are posted to the ledger; all appear on the ledger.

" Some books were delivered to other parties, some to editors, and some given away; sometimes through agents, and sometimes direct. I have examined the books of account to ascertain the number of ' Industries ' sent to agents and editors, and given away; the account books show the number given away; the shipping book and ledger show it; also the number sent to editors and to canvassers. I have made this statement so as to show the number of books — 1st, given away; 2d, delivered to editors; 3d, to canvassers, including editors." (Statement put in.)

" The books furnished to editors were paid for in advertising · the price generally was $1.80 per book. The price to agents was usually $1.80 per book, or 40 per cent. off. The plaintiffs had some contracts with editors as to other books; in the majority of cases, ' Industries' were advertised; sometimes other books were advertised with them."

All the foregoing evidence was admitted against the defendants' objection.

The following questions and answers were admitted against the defendants' objection.

" Qu. Is there any custom uniformly and generally observed in the book trade, relating t.' the publication of books by subscrip·

tion, as to how books are delivered by the publisher to subscribers? Ans. Yes.

" Qu. What is it? Ans. The custom is to furnish the books to the canvassing agent, who delivers to his subscribers, on receipt of a printed blank or letter ordering them; the custom is the same as ours and as stated before, as to receiving orders and delivery to canvassers.

" Qu. Is there a uniform custom of the trade known to you in regard to furnishing books published by subscription to editors? Ans. Yes.

" Qu. What is it? Ans. It is to sell them to editors and take their pay in advertising.

" Qu. Does it extend to the prices? Ans. No, the custom is never to charge them more than it retails for by agents, — no custom to charge them same as agents."

*Cross-examined.* " Our accounts are kept with the agents; in some cases we sell on credit to agents; no established rule; do not sell on credit to all agents; say to one in fifty or seventy-five, sell on credit; the others sometimes pay in advance, or the books are sent by express, marked ' C. O. D.' and they pay on delivery, and the express charges; their commission is 40 per cent., or we sell them to agents for $1.80 per book in cloth, $2.10 in leather, $2.40 in half morocco binding, $3.00 for half calf, and $1.50 for marble binding. I do not know what price the agents sell for. I have no dealings with subscribers than as before stated. Editors sign no subscriptions except by the contracts agreeing to receive a certain number of books in pay for advertising. We have no store for sale of books; only one office; occasionally sell at the office; a person may come from some town where there is no agent and we furnish it to him; he buys, does not subscribe; sell to such at retail price; we might have sold a few of those ' Industries ' in that way, cannot tell how many. I do not know whether it has been sold at book stores; there have been cases of retail booksellers applying at our office for ' Industries;' whether we filled the order depended upon the number ordered; if he ordered 100 copies, we should refuse; should not furnish any for him to put on his shelves to sell again; it would depend on the use he wanted to put them to; if he wanted a copy for his own use we should furnish to him, or a

friend of his, if we were acquainted with the bookseller and knew where it was going. I don't think we ever furnished more than one copy at a time; fifteen copies in all would be the whole; at agents prices, 40 per cent. off; we did not care what he sold it for; we sold with a distinct understanding he should not put it into his store to sell again; we let him have it at the agent's price, because he extended to us the same courtesy.

" Those given away were some of them complimentary; some by our agents to influential persons to exert an influence on their sales by the agents and to make more money out of it. I have no personal knowledge that these books were sold by the agents to subscribers, except as I may have seen the canvassers' books, say 2500 names.

" We had, say 1500 to 2000 agents. I do not recollect of having sold to editors for cash, or that they have applied to purchase for cash."

Wilbur H. Blakesly, called by the plaintiffs, testified: " Was formerly in employ of J. B. Burr & Hyde as shipping clerk and receiving clerk." (Shipping book shown the witness.) " This was principally in my charge." The following evidence from this witness was admitted against the defendants' objection.

" First, I received the order from the book-keeper, and packed the books according to the order, and checked the order to show it was packed, then made a duplicate of it and posted the original in this invoice book and gave the duplicate to the book-keeper, and made an entry in the shipping book from this original order, then made out a receipt for the express or railroad or boat to be signed by the carrier; the goods were then taken by the carman for the railroad or boat; if by express, their team took them.

" Most of the entries in the shipping book are in my handwriting. I marked the cases." (Carriers' receipts are exhibited in books in the usual blank forms of railroad and express company's receipts.)

John B. Burr, one of the plaintiffs, testified, against the defendants' objection: " My mode of business is as described by my clerks on the stand. I have examined my books and made memoranda so that I can give the same statement of total amounts as given by my clerks. Of the six hundred books given away one hundred, or one hundred and fifty were given away under

the contracts with contributors; there were, say fifty or seventy-five contracts. The regular publishing business is to the trade. Subscription publishing is selling to agents, who solicit subscriptions, and also publisher obtains subscriptions himself by circulars sent out, as to ministers, newspaper editors, school-teachers, and those applying for circulars in answer to our advertisements. We send them what they order, but do not fill orders from booksellers even if they send us the cash. If we sell a copy to a bookseller it is by courtesy, at agent's prices.

"In ninety-nine cases out of one hundred, the orders from editors were received in advance of the publication of the 'Industries' ordered. Editors' charges for advertising varied; their orders and advertising did not always balance; balanced by cash. None of those books have been sold to the trade. I have furnished sworn statements when called for."

*Cross-examined.* "We advertised this work extensively, and for agents. If an editor ordered a number of copies we should send them, if it did not interfere with agents. In case of advertising, we frequently sold them at retail prices and they charged retail prices. We sometimes made discounts."

The defendants called H. Vincent Butler, who testified: "I live in Boston; am a subscription publisher and bookseller of the firm of Butler & Fleetwood, and represent D. Appleton & Co., of New York, and Lee & Shepard, of Boston. We have the principal control of D. Appleton & Co.'s subscription book business in New England; and of Charles Sumner's Works in the United States, from Lee and Shepard."

Qu. "What is the signification of the term 'sale by subscription' in the trade?" Ans. "Only one, by personal application by the canvasser soliciting their subscriptions at publisher's list of prices per volume."

Qu. "What does the term mean, 'by authorized agents?'" Ans. "Sales by authorized canvassers appointed by the publisher or general agents."

Qu. "Suppose a sale of 67,000 volumes, of them 20,000 are sold to editors at wholesale prices in payment of advertisements, is the sale of the 20,000 a sale by subscription?" Ans. "It is not. A single copy might be, unless the editors are canvassers; usually one copy is given for literary notice and review. Such a sale

would have the effect to injure the sale by subscription. A book adapted to subscription sale would have a larger sale by subscription than in way of the trade, ten to one. I think the 20,000 through the editors would naturally reach a different class from what they would by subscription."

*Cross-examined.* "We ourselves publish no subscription books; have published a book jointly with a New York party; my experience has been in selling. D. Appleton & Co. is a subscription house in one department; they ship to us at Boston the 'Encyclopedia' and 'Picturesque America,' by orders from our office; they do not know the subscriber in New England. Lee & Shepard have a subscription department, and have a party in Boston to run it; these works spoken of are published solely by subscription. You cannot be supplied with the 'Picturesque America,' in bookstores, nor with Charles Sumner's Works at the office of Lee & Shepard, except you are asked to subscribe, and we are notified of it. The books are to be kept from the booksellers' shelves. Subscribers may take more than one copy, but at subscription prices. We have a delivery agent, not the canvasser, to whom we charge the books, and he is to return the books or pay cash at list prices; this course we adopted two and a half years ago. I think this course is uniform, especially when published in parts or numbers. A great many continue to supply the books, by discounts to canvassers, mostly in cases where the book is a single work like this. I should say our system is uniform with the largest publishers, as D. Appleton & Co., Lee & Shepard, Johnson & Frye, Samuel Walker & Co., of Boston."

*Reëxamined.* "Delivery by canvassers is subject to get the books into trade. It is not the custom for canvassers to send in the names of subscribers where they deliver the books. It depends on the honesty of the canvasser whether the books get into the trade."

It was agreed that no affidavit by the plaintiffs, as specified in said contracts, had been requested, except one by said Crompton, which was made and sent to him by the plaintiffs.

The defendants had made payments on statements furnished them quarterly, which included copies sold to editors, though this fact did not appear in the statements, and it was not con-

tended that the defendants knew to whom the books were delivered.

At the trial in the Superior Court, before *Brigham*, C. J., the cases were tried together. The plaintiffs offered the evidence set forth in the report of the auditor, the defendants objecting, and the same was admitted.

The defendants asked the judge to rule : 1. That the evidence was not competent or sufficient to prove such sale and delivery of the books or any of them as is required by the contracts. 2. That the books sold to editors were not sold to subscribers within the meaning of the contracts. 3. That the plaintiffs offering to sell and actually selling to editors as aforesaid, the book was not sold by subscription within the terms of the contracts, and that the defendants therefore were not liable for any of said books. 4. That the jury were at liberty on the evidence to find that the sale and delivery of the books, as they were claimed by the plaintiffs to have been made, were not a sale by subscription, and so that none of the books were sold by subscription, within the terms of the contracts, and that no liability attached therefor. 5. That the payment being made generally on account, and in ignorance that books sold to editors were included in the accounts rendered on which payments had been made, the defendants were entitled to apply such payments in the present suit toward sums due for books actually sold to subscribers.

The presiding judge ruled as requested in the second and fifth prayers, and refused the other prayers of the defendants. The jury returned verdicts for the plaintiffs for the balance due for such books as were claimed to have been sold and delivered to persons other than editors.

The defendants alleged exceptions to the refusal to give the first, third and fourth instructions; and the plaintiffs alleged exceptions to the giving of the second and fifth instructions.

The cases were reported after verdict for the consideration of this court, under the following agreement :

" If the evidence received by the auditor is insufficient to support the verdict, judgment shall be for the defendants. If the jury would have been at liberty to find for the defendants, in accordance with the fourth prayer, the verdicts shall be set aside. If the second or fifth prayers ought not to have been granted,

the verdict shall be amended accordingly; otherwise judgment for the plaintiffs on the verdict."

W. S. B. Hopkins, for the plaintiffs.

G. F. Hoar & T. L. Nelson, for the defendants.

DEVENS, J.   The contracts in these several cases, made between the plaintiffs and the defendants, were in effect on the part of the plaintiffs to advertise the business of the defendants respectively in a certain book to be published and sold by them, and on the part of the defendants to pay therefor at the rate of two cents for each copy of the book so sold.   As all the contracts contemplate that the advertisements of the defendants are to be distributed by means of a book published and sold by subscription, it was competent for the plaintiffs to show in what manner, according to the usage of the trade, such works were published and sold and the business in relation thereto conducted, and thus prove that the method adopted by them was in conformity with the usual mode which both parties must have intended by their contract.   They were further entitled to show that in conformity with such usage agents were employed by them to canvass the country for subscriptions, that orders were sent by such agents, which orders were filled by the plaintiffs by placing the books in the hands of carriers to be transmitted in accordance with them, and that such orders were accompanied by the money, except when the books were directed to be sent to be paid for on delivery, on which orders payment had subsequently been made.

As from the mode in which the business was to be conducted, according to the evidence of the plaintiffs, the defendants must have known that the publisher was not brought in immediate contact with the subscriber, and did not deliver the book to him personally, the books of account kept by the plaintiffs with such agents, and the recollection of witnesses as refreshed by them, (which evidence was admitted by the auditor,) were competent to prove a business conducted according to the usage of the trade, the transmission of the books in answer to orders on them by agents, and the payment therefor, which would justify a finding for the plaintiffs.   Although this evidence fails to show directly that the books were delivered into the hands of the individual subscribers, it is the only evidence which is reasonable and practicable in ascertaining the liability of the defendants.   As be-

tween them and the plaintiffs, it should be considered that there has been a sale and delivery of the books when the plaintiffs prove that they have done everything to place them in the hands of individual subscribers, which the contract contemplated that the publisher should do.

Nor would the evidence by which the defendants undertook to control that of the plaintiffs justify the jury in finding that the mode adopted was not a sale by subscription within the terms of the contract. The mode of delivery testified to by the defendants' witness related to subscription books published in numbers, and his testimony recognizes that many of the trade supply the books to canvassers as the plaintiffs did in the present case where the work is a single volume only.

The first and fourth prayers of defendants were therefore rightly refused.

It appears, by the plaintiffs' evidence, that a considerable number of books were sold to editors, and that the books so sold were paid for in advertising. This transaction was not, however, such a sale as was intended by the contracts, but an exchange for the commodity of the editor. The sale of a book by subscription being by personal solicitation of individuals through canvassers, those advertising might expect that the book would thus reach most directly those who would be interested in what was there advertised, and who might be those not usually resorting to bookstores. Whether the books distributed to editors would equally reach those whom by means of the subscription the advertisers were endeavoring to influence, we cannot determine. The language of the written contracts varies : in two of the cases the agreement is to pay " for each and every copy of the work sold and delivered to agents and others," and in the other two it is to pay " for each and every copy of said work sold by said Burr & Co. ; " but each contract is a bargain in reference to sales by subscription only, and the copies so delivered to editors cannot be deemed such sales.

While, however, the defendants are not to be held liable on account of the sales to editors, the fact that such were made should not prevent the plaintiffs from recovery upon those actually made by subscription. There is no stipulation in the contracts, expressly forbidding the plaintiffs from disposing of the

book otherwise than by subscription, nor was it shown to be against any usage of the trade; and such a disposition of the books as would enable the plaintiffs, in the usual course of their business, to obtain by means of them the advertising which they desired, is not necessarily inconsistent with the objects intended to be attained by sales by subscription. Indeed it may have been a positive advantage to the defendants to have the books containing their advertisements thus disposed of, they being held to no payment therefor.

The second prayer of the defendants was therefore rightly granted by the presiding judge, and the third rightly refused.

The instruction, in answer to the fifth prayer of the defendants, that the payments having been made by them generally on account, and in ignorance that the books sold to editors were included in the accounts rendered on which payments had been made, the defendants were entitled to apply such payments in the present suits towards sums due for books actually sold to subscribers, was also rightly given. The money thus paid was paid under a mistake of fact which may in this way be corrected.

*Exceptions overruled.*